16 U.S. 27 (____)
3 Wheat. 27
The NEW YORK: TROUP, Claimant.
Supreme Court of United States.

THIS cause was argued by D.B. Ogden, for the appellant and claimant, and by Hopkinson and Baldwin, for the United States.[(a)]
*28 *February 10th. LIVINGSTON, Justice, delivered the opinion of the court.
This is an appeal from the circuit court for the southern district of New York. This ship was libelled for taking on board, at the Island of Jamaica, with the knowledge of the master, 51 puncheons of rum, 23 barrels of limes, and 20 barrels of pimento, with intention to import the same into the United States, contrary to the provisions of an act of congress interdicting commercial intercourse between Great Britain and the *61] United States, *passed the 1st of March 1809, and the cargo was libelled for an importation into the United States, in violation of the provisions of the same law.
A claim was interposed by John Troup, of the city of New York, merchant, which denies the allegation of the libel, as to the intention with which the articles mentioned in the libel were put on board at Jamaica; and as to the importation, he states, that on or about the 6th of October 1811, the said ship, with the said cargo on board, being on the high seas, on the American coast, about five leagues distant from land, and having lost her rudder, and being otherwise disabled, was, by stress of weather, compelled to put into the port of New York, contrary to the will and design of the master, and against the express orders of the claimant, as owner thereof, communicated to the said master before his arrival.
On board the vessel, were two manifests of the cargo, both of which stated the cargo to have been laden on board at Montego bay, in Jamaica; but one of them declared her destination to be Amelia Island, and the other New York. The latter was delivered to an officer of the customs, and a certificate by him indorsed thereon, stating that fact, dated the 14th October 1811. The other manifest was exhibited at the custom-house in New York, on the 25th October 1811, at which time, the master took the oath usual on such occasions, stating that the said manifest contained a true account of all the goods on board, and that there were not any goods on board, the importation of which into the United States, was prohibited by law.
*62] *John Davison, the master, deposed, that he was with the said ship, at Jamaica, in August 1811. That his orders from the claimant were, not to take on board at Jamaica, any West India produce, for the United States. That the consignee of the said ship, the Northern Liberties *29 (evidently a mistake for the New York), insisted upon it, that he should take a cargo of West India produce on board, stating it, as his opinion, that the non-intercourse law would probably be repealed, before he could arrive at New York, and that, at any rate, he could stand off and on Sandy Hook, until he should receive the orders of his owner how to proceed. That he was thus induced to take the said cargo on board, with which he sailed with orders from the consignee, and with intention to obey them, not to attempt to come into the port of New York unless he received from the owner directions, off Sandy Hook, so to do; that on the 6th of October, in the same year, while on the voyage from Jamaica, they had a severe gale of wind from the south-west, varying to the southward and eastward, accompanied with a very heavy sea, which continued nearly twenty hours, in the course of which, they split the fore-sail and carried away the rudder. That on the 11th of October, they made soundings, about 40 miles to the southward of Sandy Hook, where he received a letter from the owner, by a pilot-boat, the contents of which he communicated to the crew, and told them he should wait off the Hook, until he received further orders from the owner; but they declared, that the rudder was in such a state, that it was unsafe to remain in her at sea, and that they would leave the *ship in [*63 the pilot-boat, unless he would bring her into port. That, in his opinion, it would have been dangerous and very unsafe to continue at sea with the said ship, in the condition in which the rudder then was, and he, therefore, consented to bring her into New York, believing that it was necessary to do so, for the preservation of the cargo, and the lives of the people on board; that he was towed into New York by a pilot-boat, as the pilot would not take charge of the ship, unless she was towed.
The letter of the owner, referred to in the master's testimony, is dated in New York, the 3d of October 1811, and is addressed to him, as follows:
"Not knowing if you have rum in, I take this precaution by every boat; if you have rum, you are to stand off immediately, at least four leagues, and keep your ship in as good a situation as you can, either for bad weather, or to come in, if ordered; you must get the pilot to bring up all the letters for me, &c., also, a letter from yourself, stating the state of your ship, provisions, &c., and bring them to town as soon as possible; give me your opinion of your crew, if you think they can be depended on, if we find it necessary to alter our port of departure. If you have rum in, I expect the ship must go to Amelia Island, or some other port, as they seize all that comes here. You may expect to see or hear from me, in a day or two after your being off, you keeping the Highlands N.W. of you, I think, will be a good berth. If you are within three leagues of the land, you are liable to seizure by any armed vessel."
On the 18th of October 1811, a survey was made *of the New [*64 York, by the board of wardens, which stated the rudder gone, the stern-post and counter-plank injured, the oakum worked out, the main-cap split and settled, fore-topsail yards sprung, pall-bits broken, fore-topsail sheet bill, started and broken. This injury was stated by the master to the wardens to have happened in a gale, in lat. 27° 30" N. and long. 80° W. The wardens gave it as their opinion, that the said vessel ought to be unloaded and hove out, to repair her damages, before she could proceed to sea in safety. On the 7th of November, of the same year, after the *30 New York was unloaded, the wardens again surveyed her, and reported, the middle rudder-brace broken, the crown of the lower brace gone. Some of the sheathing, fore and aft, gone, the rudder badly chafed, and so much injured, as not to be fit to be repaired.
On this evidence, the district court pronounced a decree of restitution. From this sentence, the United States appealed to the circuit court, held for the southern district of New York, in the second circuit, where that sentence was reversed. From this last decree, an appeal is made to this court, whose duty it is now to inquire, which of these sentences is correct.
If the articles in question were taken on board, with the intention of importing the same into the United States, and with the owner's or master's knowledge, a forfeiture of the vessel must be the consequence, whether she were forced in by stress of weather or not; and even if no such intention existed, at the time of loading at Jamaica, the same consequence *65] *will attach to the goods, if it shall appear that the coming in of the vessel was voluntary on the part of the master.
The claimant has first endeavored to clear the transaction of all illegality in its inception, and thinks he has offered testimony sufficient to satisfy the court, that there was no intention, at the time of lading at Jamaica, to import the cargo into the United States.
When an act takes place, which, in itself, and unexplained, is a violation of law, and the inducements to such infraction are great, it will not be thought unreasonable in a court, to expect from a party, who seeks relief against its consequences, the most satisfactory proof of innocence, especially, as such proof will generally be within his reach. If then, any papers, which in the course of such a transaction must have existed, are not produced, or if any others which come to light, do not correspond with the master's relation; and especially, if all the witnesses are in the power, and many of whom, in the interest, and under the influence, of the party, are omitted to be examined, when it is impossible that they should not be intimately acquainted with the most material circumstances, and instead of this, the chief, if not only reliance of the claimant, is placed on the evidence of the party, who, if the allegations of the libel be true, is himself liable to a very heavy penalty; when such a case occurs, a court must be expected to look at the proofs before it, with more than ordinary suspicion and distrust.
In this case, there was an importation which primâ facie was against law, *66] and was in the same degree *evidence of an original intention to import; the burden, then, of showing the absence of such an intention was thrown upon and assumed by the claimant. In doing this, he satisfies himself with the examination of the master; who states, that he had orders from his owner, not to take on board, at Jamaica, any West India produce, for the United States. What is become of these orders? Does a master sail on a foreign voyage, with verbal instructions only? This is not the common course of business. Instructions to a master of a vessel are generally in writing; and for the owner's greater security, there is always left with him, a copy certified or acknowledged by the former. If so, why are they not produced? They would speak for themselves, and be entitled to more credit than the declarations of a person so deeply interested to misrepresent the transaction, as this witness is. The court, therefore, might well throw out of the case the little that is said of these instructions, *31 so long as they are not produced; and it is not pretended, that they were not reduced to writing, or if they were, that they are lost; which, indeed, is not a very supposable event, if the ordinary precautions on this occasion have been observed.
But notwithstanding these very positive orders, the master, in direct violation of them, and at the hazard of the most serious consequences to himself, takes on board a cargo, expressly prohibited by his owner, in compliance with the directions and opinion of a consignee, whose name is also withheld, and who does not appear to have had any right to interfere in this way. So great a responsibility would have attached, upon such a palpable [*67 breach of orders, that it is a good reason for doubting whether they ever existed. Nor is this part of the master's testimony verified by the claim, which observes a profound silence in relation to these or any other orders, that may have been given. If no written instructions were delivered to the master, which we are at liberty to believe, as none are produced, a better mode could hardly have been devised to avoid detection.
It has been said, in argument, that the intention of the master's coming to the United States was altogether contingent, and depended on a repeal of the non-intercourse act, and that he, accordingly, did not mean to come in, if that act were still in force. But how does this appear? Nothing of the kind is stated in his deposition; on the contrary, his coming in, according to his own account, depended, not on the repeal of this law, but on the orders of his owner; he came, he says, on this coast, with intention to obey the orders of the consignee, not to attempt to come into port, unless he received orders from the owner, off Sandy Hook, so to do. If, therefore, he had found those laws yet in force, which he probably had heard was the case, soon after his coming on the American coast, and long before he fell in with the pilot-boat which carried down the letter of his owner, he still intended to have come in, if his owner had ordered him so to do. His intention, therefore, as taken from his own relation, is not altogether of that innocent nature which it has been represented to be. When the vessel sailed from Jamaica, does not exactly appear; all we know from the master's account is, that she was there in August, and met with a gale on the 6th *of October following. It is probable, however, from these dates, that [*68 she had been long enough at sea, to meet with one or more vessels from the United States, from which information might have been received of the actual state of things in this country in relation to to this law. Whether any such vessel were met with, we know not; but might have known, if any of the crew or of the passengers had been examined, or the log-book produced. If such information were received on the coast, and the master of the New York had persisted afterwards in keeping the sea, until he could hear from his owner, it would amount to strong proof of an original design to come here.
The opinion which has already been intimated on this part of the case, which depends on the intention with which the cargo was loaded, will be much strengthened, by proceeding to consider the plea of necessity, on which the coming in is justified, and the facts relied on, in support of this plea. The necessity must be urgent, and proceed from such a state of things as may be supposed to produce on the mind of a skilful mariner, a well-grounded apprehension of the loss of vessel and cargo, or of the lives of the crew. It *32 is not every injury that may be received in a storm, as the splitting of a sail, the springing of a yard, or a trifling leak, which will excuse a violation of the laws of trade. Such accidents happen in every voyage; and the commerce of no country could be subject to any regulations, if they might be avoided, by the setting up of such trivial accidents as these. It ought, also, to be very *69] apparent, that the injury, whatever it may be, has not *been in any degree produced, as was too often the case, during the restrictive system, by the agency of the master, and some of the crew. Does, then, the testimony in this case, carry with it that full conviction of the vis major which ought to be made out, to avoid the effects of an illicit importation? It will not be right or proper for the court, in considering this part of the case, to divest itself of those suspicions which were so strongly excited in the first stage of this transaction; for if it were not very clearly made out, that the lading of these goods on board was innocent, it will be some excuse for the incredulity which the court may discover respecting the tale of subsequent distress. On this point, also, the claimant is satisfied with the testimony of the master. Not a single mariner, not one of the passengers, although several were on board, is brought forward in support of his relation. Of the wardens' survey, notice will presently be taken. Now, admitting the master's story to be true, with those qualifications, however, which are inevitable, he has made out as weak a case of necessity as was ever offered to a court, in the many instances of this kind which occurred during the existence of the restrictive system. A gale of less than twenty hours continuance was all the bad weather that was encountered, in which it is said, the rudder was carried away and the fore-sail split; the rudder may have been injured, but it could not have been carried away, if it be true, as from the master's own account must have been the case, that the vessel, after this accident, made at least one thousand miles, in the course of the first five days, *70] immediately after. But it is said, *that is no evidence as to the place where the accident happened. Of this fact, the survey produced by the claimant himself is conclusive. It was taken from the mouth of the master himself, and if he, or the wardens, committed a mistake in this important particular, why was it not corrected by an examination of the master, or a production of the log-book? Nor has it escaped the attention of the court, that if the New York were disabled in lat. 27° 30" north, long. 80° west, she might have reached Amelia Island, her pretended port of destination, with much more ease, and in much less time than she employed in sailing more than ten degrees to the north, and taking her station off Sandy Hook; for she was, on the 6th of October, much nearer to that island, and the wind was as fair as could be desired to carry her there. The plea of distress, therefore, is contradicted by a fact which could not have existed, if it had been as great as is now pretended; nor can it be believed, if any great danger had been produced by the gale of the 6th of October, that either the crew or the passengers would have submitted, not only to come so many degrees to the north, but continue hovering on the coast, until the owner could be heard from. No leak appears to have been the consequence of the storm, no mast was lost, nor any part of the cargo thrown overboard; and if she steered and sailed as well as it seems she did, without a rudder, even a loss so very essential and serious to other vessels, must be allowed to have worked little or no injury whatever in this case.
*33 To the subsequent surveys by the *wardens of the port, so far as they exhibit the condition of the New York, but little importance is to be attached. It appears to have been an ex parte proceeding, and if all the injuries which they describe existed, as they no doubt did, it is not certain, whether they were produced by the gale spoken of, or by any other accident at sea, or by the act of the master himself; and at any rate, their recommending repairs, before she went to sea again, was very natural, the vessel being then in port; but is no proof at all, that she might not as well, and better, have gone to Amelia Island, as have come to that port.
The letter to the master, which has been produced, does not place in a very fair light the pretensions of the claimant. However unpleasant the task, the court is constrained to make some remarks on it. It seems agreed, that it is but little calculated to lull the suspicions which other parts of this case have excited. The interpretation resorted to by the claimant, is at variance with the only appropriate sense of the terms which are used, and with the most manifest intentions of the writer. By changing the port of departure, nothing else could have been intended, than to legalize the voyage, by the crew swearing that the New York had sailed from some West India possession, not under the dominion of Great Britain. This sense of the letter, which seems inevitable, is but little favorable to the character of the claimant, or to the integrity of the transaction. Nor should it be forgotten, that the master does not decide upon coming in, until this letter is received; whereas, if his situation were as perilous as he now represents it, he could not, and would not *have waited for orders. [*72
It is unnecessary to rely much on the two manifests; although one of them, bearing on its face a destination for New York, is certainly much at variance with the pretended contingent destination of this vessel. The oath which the master made at the custom-house, that no goods were on board of the New York, the importation of which was prohibited by law, was not only false, but is an evidence of very great incaution on his part; for if the collector would administer the oath in no other form, it was no reason whatever for his attesting to a fact, the falsity of which was apparent on the very manifest which was attached to the oath.
The alleged opposition of the crew to wait for further orders, and their threats to come up in the pilot-boat, have not been overlooked. This allegation depends altogether on the credit due to the master, and is a circumstance not very probable in itself. No pilot, in the then condition of the New York, could have been so ignorant, and so regardless of his duty, as to take from her, without the master's consent, any part, much less the whole, of her crew. If the threat, therefore, were really made, the master ought not to have been alarmed at it, and probably, would have treated it with contempt, if it had not been suggested by himself, or had not suited his then purpose; at any rate, if by remaining longer at sea than he ought to have done, or by hovering on the coast, in expectation of orders from his owners, after having received so many injuries on the 6th of October, any additional danger were produced, or well-grounded apprehensions and opposition on the part *of the crew, he would not, without great reluctance [*73 on the part of the court, be permitted to draw any very great advantage from a circumstance which his own imprudence, if not his own fault, occasioned.
*34 The towing of the New York into port by a pilot-boat, is supposed to be a circumstance which must have proceeded from her disabled condition. This does not follow. It may have proceeded from the request of her master; for it can hardly be believed, that a vessel that had behaved so well, after the gale of the 6th of October, and which is not stated to have met with any injury from subsequent causes, should, the moment it was necessary to take a pilot on board, be so ungovernable, as to require towing into port. If this were really the case, it is a matter of some surprise, that the claimant should not have recourse to the pilot himself, to establish the fact, and the reason of it.
Notwithstanding the untoward circumstances, which have already been taken notice of, and the temptations which existed to commit violations of the restrictive laws, which it is known were great, and led to frequent infractions of them, the court is asked to acquit this property, without producing the letter of instructions to the master, or the orders to the consignee in Jamaica, where it is alleged there was one, although his name is not given, nor any bill of lading, or invoice or log-book, and in the face of two manifests, the one purporting a destination contrary to law. To expect an acquittal, in a case involved in so much mystery, it is not too much to say, that the uncommon circumstances attending it should have been explained *74] *and accounted for in the most satisfactory manner. But when, for this explanation, the court is referred to the unsupported testimony of the master, who is himself the particeps criminis, if any offence have been committed, and who stands convicted on the papers before us, of a palpable deviation from truth, and whose account, if true, would have induced him and his crew to direct their course to Amelia Island, instead of encountering a more northern latitude, we must believe, that the mate and others, who might have proved the fact of distress, if real, beyond all doubt, were not produced, not from mere negligence or inattention, but from a conviction that they would afford no sanction to the master's relation. It is now near eighteen months since the decree of the circuit court was pronounced, in which an intimation was given, that further testimony would be admitted here, and yet none has been produced.
It is the opinion, therefore, of a majority of the judges, that the sentence of the court be affirmed, with costs.
JOHNSON, Justice. (Dissenting.)
This is a libel against the cargo of the ship New York. The vessel herself was libelled for lading a cargo, with intent to violate the laws of the United States; but the cargo in this case is libelled as forfeited, for having been imported into the city of New York, contrary to law. The intent with which it was laden on board becomes immaterial as to the cargo, except so far as it might operate to cast a shade of suspicion over the act of coming into port. The defence set up is, that *75] the *ship sailed with the alternate destination to go into New York, if legal, and if not, to bear away for Amelia Island. That she was ordered to call off the port of New York for information; and in her voyage thither, she encountered a storm, from which she sustained such damage as to oblige her to put into New York for the safety of the lives of the passengers and crew. That a vessel, under such circumstances, has a right to call off a port for information, has been decided in various cases; and it has *35 also been decided, and is not now questioned, that if, in the prosecution of that voyage, she sustains such damage as renders it unsafe to keep the sea, she might innocently enter the ports of the United States to repair, and resume her voyage. The laws of the United States make provision, in such cases, for securing the cargo, to prevent an evasion of our trade-laws.
There are, then, but two questions in the case: 1st. Whether her actual state of distress was such as to make it unsafe for her to keep the seas? 2d. Whether that state of distress was the effect of design or accident? Admitting that the greatest frauds that can be imagined had been proven to have been in contemplation, yet, as the libel does not charge a lading, with intent to import into the United States, it is immaterial to this decision, to inquire what was intended, if it be made to appear, that the distress was real, and not pretended or fictitious. Now, so far as I can judge, the facts in this case are such as leave nothing for the mind to halt upon. The distress was obvious to the senses, and the nature of it such as could not have been produced by the ingenuity of man. Without dwelling *upon less [*76 important particulars, it appears, from the surveys, that the fore-topsail yards were sprung; the main-cap split and settled; and the rudder carried away, or, in the words of the survey, gone; and the stern-post, after-sheathing, and counter-plank much chafed. These words carried away and gone, mean, in nautical language, wholly disabled or rendered useless. And that such was the state of the rudder is evident, from the contents of the surveys. For, when the vessel was hove keel out, it appeared, that the middle rudder-brace was broken, and the crown of the lower brace gone; so that it is evident, that the rudder must have swung in the chains. And that this was the case, appears from several particulars, also gathered from the surveys: 1st. The impossibility, on any other supposition, to believe, that the surveyors would, on the first survey, before the vessel was hove down, report the rudder gone. 2d. The chafed state of the rudder and stern-post could only have been produced by the action of the rudder against the stern-post, when forced to and fro by the waves, and must have occurred at sea. And lastly, the same cause naturally produced the injury reported to have been done to her counter-plank and after-sheathing. These injuries, I repeat, could not have been done by the hand of man, especially, those sustained under water; and although I see neither fraud nor falsehood in the case, yet I care not though every word of the testimony, besides, be false: that falsehood could neither have produced these injuries, nor repaired them; and the evidence is sufficient, to show that the safety of *the lives of [*77 the passengers and crew required the vessel to put into port, and therefore, it was innocent.
In this opinion, I am supported by two of my brethren, the CHIEF JUSTICE, and Mr. Justice WASHINGTON.
Decree affirmed.
NOTES
[(a)] The latter counsel cited The Eleanor, Edwards 159, 160. In this case, Sir WILLIAM SCOTT observes, that, "real and irresistible distress must be, at all times, a sufficient passport for human beings, under any such application of human laws. But if a party is a false mendicant, if he brings into a port a ship or cargo, under a pretence which does not exist, the holding out of such a false cause fixes him with a fraudulent purpose. If he did not come in for the only purpose which the law tolerates, he has really come in for one which it prohibits, that of carrying on an interdicted commerce, in whole or in part. It is, I presume, an universal rule, that the mere coming into port, though without breaking bulk, is primâ facie evidence of an importation. At the same time, this presumption may be rebutted; but it lies on the party to assign the other cause, and if the cause assigned turns out to be false, the first presumption necessarily takes place, and the fraudulent importation is fastened down upon him. The court put the question to the counsel, whether it was meant to be argued, that the bringing a cargo into an interdicted port, under a false pretence, was not a fraudulent importation, and it has not been denied, that it is to be so considered." "Upon the fact of importation, therefore, there can be no doubt; and consequently, the great point to which the case is reduced, is the distress which is alleged to have occasioned it. Now, it must be an urgent distress; it must be something of grave necessity; such as is spoken of in our books, where a ship is said to be driven in by stress of weather It is not sufficient, to say, that it was to avoid a little bad weather, or in consequence of foul winds; the danger must be such as to cause apprehension in the mind of an honest and firm man. I do not mean to say, that there must be an actual physical necessity, existing at the moment; a moral necessity would justify the act; where, for instance, the ship has sustained previous damage, so as to render it dangerous to the lives of the persons on board to prosecute the voyage. Such a case, though there might be no existing storm, would be viewed with tenderness; but there must be, at least, a moral necessity. Then, again, where the party justifies the act upon the plea of distress, it must not be a distress which he has created himself, by putting on board an insufficient quantity of water, or of provisions, for such a voyage; for there, the distress is only a part of the mechanism of the fraud, and cannot be set up in excuse for it. And in the next place, the distress must be proved by the claimant in a clear and satisfactory manner; it is evidence which comes from himself, and from persons subject to his power, and probably involved in the fraud, if any fraud there be, and is, therefore, liable to be rigidly examined."